IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PATRICK RATHSACK,

       Petitioner,               No. CIV S-04-2097 FCD GGH P

   vs.

PEOPLE OF THE STATE
OF CALIFORNIA,

       Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction for lewd acts on a child under 14 by use of force or duress (Cal. Penal Code § 288(b)(1)), burglary (Cal. Penal Code §§ 459, 462(a)), and misdemeanor assault (Cal. Penal Code § 240).  Petitioner is serving a sentence of 25-years-to-life.

        Petitioner challenges his conviction on three grounds: 1) insufficient evidence to support the jury's finding that petitioner was not insane at the time he committed the offenses; 2) insufficient evidence to support the jury's finding that petitioner violated Cal. Penal Code § 288(b)(1); and 3) his sentence violates the Eighth Amendment.  After carefully considering the

1

1    record, the court recommends that the petition be denied.

2    II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

3          The AEDPA applies to this petition for habeas corpus which was filed after the

4    AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

5    117 S. Ct. 2059 (1997).   The AEDPA "worked substantial changes to the law of habeas corpus,"

6    establishing more deferential standards of review to be used by a federal habeas court in

7    assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

8    Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

9          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

10   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

11   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

12   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

13   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

14   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

15   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

16   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

17         "Unreasonable application" of established law, on the other hand, applies to

18   mixed questions of law and fact, that is, the application of law to fact where there are no factually

19   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

20   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

21   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

22   deference is not blindly automatic, "the most important point is that an *unreasonable* application

23   of federal law is different from an incorrect application of law....[A] federal habeas court may not

24   issue the writ simply because that court concludes in its independent judgment that the relevant

25   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

26   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

objectively unreasonable nature of the state court decision in light of controlling Supreme Court

authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated

awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

established Supreme Court authority reviewed must be a pronouncement on constitutional

principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in

dispute in any reasoned opinion, the federal court will independently review the record in

adjudication of that issue.  "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent state

court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2003).

In reviewing a state court's summary denial of a habeas petition, the court "looks

through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

F.3d 1072, 1079 n. 2 (9th Cir. 2000)(citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S.Ct.

2590 (1991)).  In the instant case, the California Supreme Court issued a summary denial of

petitioner's petition for review, which raised the claims raised in the instant petition.  Order by

California Supreme Court lodged March 8,2 005. Accordingly, the court looks through to the

reasoned decision of the California Court of Appeal.

/////

III. Factual Background

The opinion of the California Court of Appeal contains a factual summary of petitioner's offenses. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

I. Guilt Phase Evidence

Shannon Meely, the on-site manager for an apartment complex in Sacramento, lived in apartment 3. Defendant lived in apartment 127. Richard Latham lived in the same complex. Arthur Stewart and his children lived in the apartment just above defendant's.

At about 11:00 p.m. on May 12, 2000, Meely conducted a walk-through inspection of the complex. After she returned to her apartment, she heard a noise outside like someone was kicking a door or a wall. She went out to investigate and saw a person climbing up the fence into the patio of Stewart's upstairs apartment. Meely shouted to the person, "what are you doing?" The person responded, "I have to save the little girl."

Meely ran back into her apartment and called Latham for help. Latham showed up in about a minute and Meely went upstairs to investigate. She banged on the door of Stewart's apartment.

Almost immediately, defendant unlocked and opened the door. He was dressed in camouflage pants, cowboy boots, and a trench coat. Meely said he "looked like a zombie. [¶]...[¶] Like he was set to do a mission." Latham testified defendant looked "like he was not himself. It was like he was off in another world. Seemed like he was spaced out for a second like he was surprised he got caught up there." Defendant acknowledged Meely by name. He told Meely he was there to save the little girl. Latham testified defendant said there was a little girl who was bound and gagged in a "shitty" diaper and had been there for three days.

Meely saw a six-year-old girl sitting on the couch wrapped in a blanket. She looked surprised or frightened–like she had just been awakened. Defendant walked back to the girl. Meely shouted for Stewart to wake up. Stewart came into the room in his boxers.

Meely told defendant she was going to call the sheriff. Defendant responded by telling Meely not to call the police and that this matter did not concern her. At that point, defendant lunged toward Meely. Latham jumped to her rescue and subdued defendant until the police arrived. Defendant smelled like he had been drinking beer, but he was not staggering, and his speech was not slurred.

After Latham told defendant "it's me, buddy" a couple times, defendant calmed down. Latham testified defendant appeared "like he was confused on what–not sure of his actions of what he was doing. He just wanted to go back down and be in his apartment and be left alone." Defendant asked for a cigarette and seemed back to normal when Meely gave him one. While Latham held defendant,

4

defendant kept telling Latham he wanted to go back down to his house.

Meely testified that not more than a couple of minutes elapsed between the time she called Latham and the time defendant opened the door.

When Sacramento Sheriff's Deputy Andrew Buchanan arrested defendant, he had a screwdriver in his pocket. Defendant appeared "very calm" and distant to the deputy. Defendant was unable to answer the deputy's questions about what was going on. The deputy reported that defendant was "mentally unstable." Despite his refusal to talk about what he was doing, defendant told the officer he was manic depressive and on three types of prescription medications.

At trial, the six-year-old victim testified she was trying to sleep in the living room of her home on a mat. Defendant came into the room through the sliding glass door. Defendant picked her up and put her on his lap on the couch facing away from him. Defendant touched her in the "wrong area," referring to the area between her legs. She also referred to it as her "private," meaning her vaginal area. Defendant did not say anything to her that night. The victim testified defendant touched her on top of her underwear, but could not say how long defendant touched her. Defendant did not move his hand or her underwear while he touched her. She tried to get away from defendant but could not. On cross-examination, the victim testified her father told her to stick to her story and to stay on top of it.

Prior to trial, the victim's story was inconsistent. On the night of the incident, the victim told Deputy Buchanan defendant had not touched her "privates." The victim told her father the same story that night.

The night after defendant broke in, the victim told her father a little more about the incident. The victim said defendant had put his hand over her mouth so she could not scream. Stewart also testified his daughter told him defendant had touched her chest area and vaginal area.

As a result of these revelations, Stewart called the sheriff to take a second report. Sheriff Deputy Paul Jbeily responded to that call. He interviewed the victim, who told him defendant had touched her groin area. At the request of Deputy Jbeily, Stewart examined his daughter in another room. At trial, Stewart testified the victim's private area was red during that examination and that he would have told the officers that if they had asked. Deputy Jbeily, on the other hand, reported Stewart told him he had examined the victim's vaginal area and reported no redness or bleeding.

About a month after the incident, the victim was interviewed in the Multi-Disciplinary Interview Center by a social worker. The basic facts the victim relayed to the social worker were consistent with her statement the day after the incident. During that interview, however, the victim told the social worker defendant touched her underwear on her "choo-choo." [Footnote 2]

> [Footnote 2: At trial, the victim testified she did not use the term "choo-choo" to refer to her privates.]

The victim also stated defendant touched her top or her "tits."  The victim also said defendant touched her mouth.

Meely was the manager of the complex during the time defendant resided there.  She had no problems with defendant during this time.  About two months before this incident, she walked by defendant's apartment.  His door was open and the lights were off.  Meely noticed large holes had been punched through the apartment's walls.  Meely reported this to her supervisor.  Meely's supervisor reported defendant to the police and he was taken in for a mental health examination.  He was gone for six or seven days.

The victim's father, Stewart, had known defendant for a couple of years as neighbors.  Stewart and defendant acknowledged each other as they passed in the complex.  Defendant had been up to Stewart's apartment a few times to complain about noise or Stewart's children.

At the conclusion of the guilt phase, the jury convicted defendant on one count of lewd acts on a child under the age of 14 years by force or duress.  On the second lewd act count, defendant was acquitted of the crime charged, but he was convicted of the lesser included offense of misdemeanor assault.  The jury further found the one-strike enhancement to be true.  The defendant was also convicted of burglary.

II.  Sanity Phase Evidence

Because defendant challenges the sufficiency of the evidence on the question of defendant's sanity, we recount the testimony provided on this subject in detail.  The parties stipulated the evidence received in the guilt phase was deemed received in the sanity phase and that the jury could consider it in its deliberations.  During the sanity phase, the defendant testified along with two psychologists.  Defendant was born in 1967.  He testified he was hospitalized two times as a teenager.  The first time was for depression.  The second hospitalization occurred when defendant was 16 and he agreed to go into an alcohol and drug abuse center that was within a state mental hospital.  He stayed in that latter program for several months.

Defendant moved to California in 1984.  He admitted to using drugs between 1984 and 1986.  He drank alcohol, smoked marijuana and used methamphetamine.  Defendant was admitted to a detox center in 1986.  After his treatment program, he was in a halfway house for about a year.  Defendant claimed he stayed off drugs for the following 11 years–between 1986 and 1997.  Defendant traced the onset of his mental problems to an accident at a lumber company where he stacked trusses.  One day a truss slipped off a forklift and hit him in the head.  Defendant claimed that after this accident, he went through a big change and started to experience depression and paranoia.  He stopped trusting his girlfriend, his friends, and started to hear voices.  Defendant was on disability for approximately four years after this accident.

In 1994, defendant was hospitalized for his first psychotic break.  He was hearing voices and thought people were after him.  Defendant gave the jury detailed testimony about these hallucinations.  When defendant was discharged, the doctor

6

prescribed Zoloft for him.  Defendant still heard voices.  The voices stopped sometime in 1994.

Defendant was on disability for mental illness when he was hospitalized again in 1995 and 1996.  He was homeless at this time.  Thereafter, he was committed to the Sacramento County Mental Health Center (SCMHC) and released after 24 hours because he was not a danger to himself or others or incapable of taking care of himself.

Defendant lived at a halfway house for mentally ill people for a year.  During this time, he dated women, but he did not engage in any long-term relationships.  Defendant stopped dating altogether in 1998 because his relationships were causing him too much stress.

After his time at the halfway house, defendant moved to the apartments at which the incident took place.  He lived there for about four years and worked irregularly for a telemarketing firm.  Then he had another breakdown and did not work anymore.  During this last breakdown, defendant was hearing voices.  He thought the voices were coming from the apartment above him, the television, the radio, and from the airwaves.  He thought he was being tortured and kept under surveillance.  He also believed there were several plots going on that included the FBI, the Hells Angels, and World War III.  Defendant stopped taking his medication.

In an unrelated incident, defendant testified he entered a stranger's house at the request of the voices.  He went into the kitchen and the living room and ultimately was arrested when he left the home.  Defendant spent a month in the county jail.  Then he returned to his apartment.  Defendant continued to receive Social Security income for disability.

Shortly before his May 2000, commitment to SCMHC, defendant was trying to start his own business and was working long hours.  He started to hear voices again.  Defendant started to think people were watching him and talking to him as he walked down the street.  He punched holes in the walls of his apartment because the voices asked him to demonstrate his martial arts techniques.  Defendant testified he believed World War III was going on and it did not matter what he did to his apartment.  The police visited his apartment the next day and that led to defendant's hospitalization at SCMHC in early May 2000.

He received medication at SCMHC, and when he was discharged, he was stabilized enough to know he was hearing voices.  That stability faded over the next few days.  Defendant received a referral to a mental health center for further medication.  Under the referral, however, the earliest he could be seen by a doctor was two weeks away.  Thus, defendant planned to go to the next available walk-in appointment–six days after he was released.

Unfortunately, this incident occurred before he was able to carry out that plan.  Defendant described the events of the day of the incident.  He went outside of his apartment a couple of times that day, but did not leave the area.  He thought the few people he saw were trying to shoot and kill him.  He was also hearing voices.  He thought he was speaking to the Russian President and directing United States

generals about World War III through bugs in his apartment.  Defendant believed a nuclear war had already started.

Defendant was also under the impression his ex-girlfriend was upstairs in the apartment above him and trying to torture him.  At about 11:00 p.m., defendant left his apartment because he had to leave Sacramento to do something with the Russians.  He climbed up onto the balcony of the apartment above him.  He entered the apartment, sat on the couch, and saw a bundle on the floor.  He reached down for the bundle and the victim sat up.  Defendant picked her up by the armpits and sat her down next to him and told her it was okay.  The voices told him the girl was an orphan from Chechnya.  Defendant testified, "Then I got the feeling that something was wrong with this situation."  Next, he walked to the door and Meely and Latham were out front.

At the jail that night, defendant was placed in the jail's psychiatric ward because he threw a kick at another inmate.  Defendant testified he has been on medication at the jail since he was incarcerated.  He had not heard voices for many months.  While he was testifying, defendant claimed to know the difference between right and wrong.

On cross-examination, defendant admitted to having abused methamphetamine around 1997.  He also used marijuana in 1998.

Defendant knew the people who lived in the apartment above him had children.  Defendant continued to deny that he molested the victim.  He also claimed he did not speak with Meely prior to entering the apartment.  Defendant accused Meely and the victim of lying about what happened.  Defendant claimed he did not know why he had a screwdriver in his pocket.  He also asserted that even in the midst of this delusion, he knew it was not right to molest children.  When he was confronted by Meely and Latham, defendant testified, "I realized I'd done something that wasn't right."

Defendant also admitted he knew putting holes in his apartment was wrong.  That was why he called his apartment manager to offer to fix the damage.  Defendant also testified that on prior occasions he resisted the voices' demands that he steal because he knew stealing was wrong.  During his prior 1994 episode of hallucinations, defendant knew it was wrong to kill someone.

Defendant testified generally it takes months for him to feel okay after a psychotic episode.  After a day or two of being on medication, he can understand the difference between reality and unreality.  Defendant has been in the general jail population since 72 hours after he was committed to the facility.

III.  Testimony of Dr. Lorin Frank

Psychologist Dr. Lorin Frank testified on defendant's behalf.  Defendant retained Dr. Frank.  Dr. Frank examined defendant's prior hospitalization records.  Defendant had been first hospitalized in a psychiatric center at age 17.  He had been hospitalized five or six times primarily for hearing auditory hallucinations or being delusional.  The doctor said that most of the diagnoses shared the common thread of schizophrenia.  Dr. Frank said on May 9, 2000, defendant was diagnosed

8

as malingering, having bipolar disorder, being depressed, and having histrionic traits.  The records also showed defendant was taking a number of different medications to treat schizophrenia symptoms.

Dr. Frank met with defendant twice in August 2000 (three months after the incident) to determine whether he fit the criteria for legal insanity.  When Dr. Frank met with defendant, his mental condition had stabilized, presumably because defendant had been taking his medication.

During his interviews, defendant told Dr. Frank that immediately before the incident at issue here, defendant believed he was being followed and pursued by different United States government agencies.  Defendant believed he had some special powers that these agencies wanted to use and the agencies were trying to control him through thought broadcasting through the television or computer.  Defendant reported he had been released from the psychiatric hospital without his medication two or three days prior to this event.  He was trying to stay in his apartment until he could get his prescription filled.  Defendant claimed to have climbed to the upstairs apartment to evade the government agencies.  In contrast to defendant's trial testimony, defendant told Dr. Frank that while he was climbing upstairs, he was discovered, and he told the people not to worry, there was a girl tied up upstairs.  When he went into the apartment, the victim was there and he picked her up and hugged her.  Defendant denied molesting the victim, despite the fact Dr. Frank never asked him whether he had.

Dr. Frank administered his Minnesota Multi-Phasic Personality Inventory II (MMPI), an IQ test, the Rorschach Inkblot test, and the M test.  According to Dr. Frank, defendant's responses to each of the tests were internally consistent with each other.

The MMPI indicated significantly elevated results for defendant on the schizophrenia scale, the paranoia scale, the psychopathic deviant scale, the depression scale, and the anxiety scale.  The MMPI indicated that it was valid for defendant and that he was answering the questions honestly.  The IQ test showed defendant had an average IQ.  Dr. Frank said defendant's responses to the M test, a test to measure malingering, showed he was not malingering–or faking his symptoms.

According to Dr. Frank, defendant's response to the Rorschach Inkblot test showed he "is in a state of chronic and substantial stimulus overload resulting from persistent difficulties in mustering adequate psychological resources to cope with the demands being imposed on him by internal and external events in his life, and that his adaptive capacities are not sufficient for him to manage ideational and emotional stresses in his life without becoming unduly upset by them."

Dr. Frank also diagnosed defendant as schizophrenic, paranoid type.  He also diagnosed substance abuse and considered defendant's psychosocial stressors to be severe.

Based upon his examination of the police report, records, tests, and interview with defendant, Dr. Frank concluded defendant met the definition of legal insanity at the time he committed the acts.  Dr. Frank believed defendant was unable to

9

appreciate the nature and quality of his actions.  Dr. Frank also believed defendant "would in most cases not be able to distinguish right from wrong, and what I mean by that is that information that came to him under the category of his delusions, he would not be able to understand right from wrong."  Among his other conclusions, Dr. Frank concluded defendant could not act in a purposeful, goal directed manner to execute a plan of action.

Dr. Frank also explained that schizophrenics frequently respond well to incarceration because there is a great deal of structure around them and their stress levels decrease.  That is, there is personnel to take care of them and provide their medication.

On cross-examination, the People challenged Dr. Frank's assumptions and his potential bias. Dr. Frank explained he is retained by defendants 98 percent of the time and he concludes that about 20 percent of those referred to him for insanity reviews to actually be legally insane.

Dr. Frank admitted to not having interviewed any of defendant's family members or any of defendant's prior psychologists who had evaluated him.  Dr. Frank confirmed it would be best to evaluate defendant as close to the time of the incident in question as possible.

Dr. Frank testified it is not unusual for men who molest children to be inadequate in adult sexual relations.  He also stated defendant reported he had stopped dating women about five years prior to this incident.

Dr. Frank also testified that some chronic drug users may have symptoms that appear similar to schizophrenia.  Defendant told Dr. Frank he used amphetamines and cocaine in the past, but that he had not used them in the past two years.  Defendant refused to take a drug test when he was hospitalized the week just before this incident.  Dr. Frank, further, did not review any of the jail medical records showing how defendant had been treated between the time he was incarcerated and the date of his interviews with Dr. Frank.

Dr. Frank acknowledged defendant had been diagnosed by the SCMHC as malingering on May 9, 2000 (three days before the incident).  Despite his claim that most of the prior hospitalizations were for schizophrenia, Dr. Frank also admitted that defendant had been diagnosed as having major depression in 1998, not schizophrenia.  And, in 1996, defendant was diagnosed with bipolar disorder. In 1994, defendant was diagnosed as poly-substance abuse in remission and not as schizophrenic.  Dr. Frank also stated it would be "not typical" for someone who is schizophrenic to be in and out of touch with reality within a relatively short period of time.

Dr. Frank admitted the Rorschach Inkblot test, the IQ test, the M test, and the MMPI test did not determine defendant's legal sanity.

Dr. Frank conceded the jury could evaluate defendant's ability to engage in goal-directed behavior in determining whether defendant understood right from wrong or appreciated the nature of his actions.  Dr. Frank stated defendant may have engaged in goal-directed behavior if he had covered the victim's mouth to stop her

from screaming and prevent himself from getting caught. Dr. Frank also testified that defendant's possession of a flat-head screwdriver could be construed as a goal-directed behavior to break into the apartment. Dr. Frank said that defendant's actions of molesting the victim in the short time available could also be construed as goal-directed behavior.

Dr. Frank stated it appeared that defendant understood at some level he was going to be in trouble when Meely told him she was going to call the police and he tried to prevent her from doing so. Dr. Frank admitted that denying a child molest occurred demonstrated defendant appreciated the wrongfulness of his actions.

IV. Testimony of Dr. Janice Nakagawa

Defendant also presented the testimony of psychologist Dr. Janice Nakagawa. Dr. Nakagawa was originally retained by the court to perform a sanity evaluation of defendant.

When she first began to testify, Dr. Nakagawa had reviewed defendant's jail medical records but failed to review any records prior to defendant's incarceration. Over night, during a break in her testimony, she was presented with the other medical records that were provided to Dr. Frank. Dr. Nakagawa noted these records contained quite a number of different diagnoses for defendant: "schizophrenia, bipolar disorder, the substance abuse, but the primary or principal [sic] diagnosis, whether it was depression, the theme was of some kind of psychotic condition."

In February 2001, Dr. Nakagawa performed a clinical interview of defendant over two separate occasions for a total of about five hours. Defendant relayed his mental health history to the doctor starting in 1987. Defendant's statements to Dr. Nakagawa were consistent with his trial testimony.

Dr. Nakagawa also administered a series of psychological tests to defendant: Bender Gestalt, a select portion of Wechsler Adult Intelligence Scale, Scale-III, Millon Clinical Multiaxial Inventory-III (MCMI), Draw-A-Person, House-Tree-Person, Rorschach Inkblot test, and Rogers Criminal Responsibility Assessment Scales.

Defendant's performance on the Bender Gestalt test presented some mild indicators of brain damage. Like Dr. Frank, Dr. Nakagawa concluded defendant had average intelligence.

Defendant's performance on the MCMI test showed elevations on the personality patterns involving depression, the avoidant personality, and the schizoid personality. Defendant also presented an elevated level of masochism. According to Nakagawa, the validity scales for the MCMI test indicated defendant responded to the questions in a straightforward, nondefensive way.

Contrasted with Dr. Frank's diagnosis, Dr. Nakagawa diagnosed defendant as having major depression recurrent with psychotic features. The psychotic features were his false beliefs and auditory hallucinations. Dr. Nakagawa also did not note any malingering or exaggeration of defendant's symptoms. In terms of her

11

diagnosis, Dr. Nakagawa further concluded, "I am not wedded to my diagnosis or conclusion that he suffers from major depression recurrent. It is possible that it's a plain psychotic disorder not otherwise specified." Dr. Nakagawa concluded defendant suffered from a mental disorder at the time of the offense. Dr. Nakagawa believed defendant did not have the ability to understand the nature and quality of his actions and was unable to distinguish between right from wrong at the time of the incident. She based this conclusion on the information the defendant provided to her that he intended to save others, not harm them, and his very elaborate belief system about World War III.

Dr. Nakagawa concluded defendant was not able to act in a rational, purposeful, or goal-directed way to execute an appropriate plan of action. Defendant did not have the capacity to understand the rights of others, according to Dr. Nakagawa. Thus, the doctor concluded defendant was legally insane at the time of the event. Her overall conclusion was based upon the testing, the review of the records, and her clinical interview with defendant.

The People challenged Dr. Nakagawa's testimony on cross-examination. Dr. Nakagawa admitted she performed no independent investigation, but rather relied on what was supplied to her by defense counsel. Further, she did not consult with any other mental health professionals about this case. She did not contact members of defendant's family, anyone from his apartment complex, or any of the jail staff who dealt with him.

Dr. Nakagawa acknowledged the number of different mental health diagnoses defendant had received over the years, although she believed each diagnosis had the common trait of psychotic symptoms. Further, contradicting Dr. Frank's opinion, Dr. Nakagawa did not believe defendant suffered from schizophrenia. Dr. Nakagawa also acknowledged that defendant had been diagnosed as malingering when he was discharged the week before this incident. The only possible explanation Dr. Nakagawa could provide was that defendant stabilized during his earlier treatment program causing his treating physician to doubt the true nature of his condition. Dr. Nakagawa was not troubled by the fact that defendant stabilized very shortly after he was incarcerated. She surmised his medication had taken effect, although she was quick to point out she was not a psychiatrist.

Dr. Nakagawa agreed methamphetamine use might create symptoms similar to someone having psychosis from mental illness. Dr. Nakagawa also stated defendant underreported his prior substance abuse problems and that an accurate assessment of defendant's prior drug use was important to her.

Dr. Nakagawa stated the IQ test did not measure anything that related to whether defendant was sane. She admitted the Draw-A-Person test and House-Tree-Person test similarly did not directly bear on the question of whether defendant was sane. The Bender-Gestalt test did not bear on the question of defendant's sanity, nor did it show significant indicators of brain damage. The Rorschach Inkblot test did not address defendant's sanity on the day of the event. Finally, Dr. Nakagawa admitted the MCMI test did not measure defendant's sanity at an earlier time.

\\\\\

Dr. Nakagawa testified if defendant picked up the victim and covered her mouth, she would consider that goal-directed behavior toward the completion of the crime.  Further, Dr. Nakagawa testified that one explanation of defendant having a screwdriver in his pocket was that defendant planned to engage in the goal-directed behavior of breaking into the apartment.  Dr. Nakagawa admitted defendant's actions of lunging at Meely could be considered goal-directed behavior if he was not psychotic.

V.  The People Rebuttal.

In rebuttal, the People presented the testimony of Sacramento Sheriff's Deputies John Carriger and James Tomasetti.  These two deputies supervised defendant in the jail since his arrest for this incident.  Deputy Carriger testified defendant was placed in the inpatient psychiatric floor for three days when he was first brought in to the jail after his arrest.  After the three days, he was placed into protective custody.  Defendant had not been a disciplinary problem at the jail.  He followed directions and had not displayed any behaviors that might be indicative of mental illness.  Carriger also testified defendant was on "psych" medication while he was at the jail.  Deputy Tomasetti testified during his jail encounters with defendant, Tomasetti never had any problems with him.

The jury found defendant to be sane at the time he committed the crime.

Opinion of California Court of Appeal lodged March 8, 2005, pp. 2-21.

IV.  <u>Discussion</u>

   A.  <u>Sufficiency of Evidence re: Lewd Intent</u>

   *Legal Standard*

       When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  Under <u>Jackson</u>, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas.  <u>Adamson v. Ricketts</u>, 758 F.2d 441, 448 n. 11 (9th Cir. 1985), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 789 F.2d 722 (9th Cir. 1986) (en banc), <u>rev'd</u>, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts."  <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable

1  doubt.  It is whether rational jurors could have reached the same conclusion that these jurors

2  reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

3         If the trier of fact could draw conflicting inferences from the evidence, the court in

4  its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

5  469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

6  at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

7  trier of fact could have found the conviction scenario beyond a reasonable doubt.

8         In reviewing the sufficiency of the evidence supporting a conviction, we search

9  the record to determine "whether a reasonable jury, after viewing the evidence in the light most

10  favorable to the government, could have found the defendants guilty beyond a reasonable doubt

11  of each essential element of the crime charged."  United States v. Douglass, 780 F.2d 1472,

12  1476 (9th Cir.1986).  The relevant inquiry is not whether the evidence excludes every hypothesis

13  except guilt, but whether the jury could reasonably arrive at its verdict.  United States v.

14  Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L.

15  Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on

16  other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

17         *Analysis*

18         Petitioner alleges that there was insufficient evidence to support his conviction for

19  lewd acts.  The California Court of Appeal rejected this claim for the following reasons:

20         Defendant argues substantial evidence does not support the jury's finding
       defendant had lewd intent when he picked up the victim and touched her vagina.
21       We disagree.

22         "Criminal intent will rarely be shown by direct evidence and must frequently be
       inferred from a defendant's conduct."  (People v. Gilbert (1992) 5 Cal.App.4th
23       1372, 1380.)  "The intent to commit a violation of Penal Code section 288 is 'the
       intent of arousing, appealing to, or gratifying the lust or passions or sexual
24       desires' of the perpetrator or of the victim. [Citation.]"  (People v. Imler (1992) 9
       Cal.App.4th 1178, 1181.) "[L]ewd conduct may be inferred from the
25       circumstances of the offense."  (Id. at p. 1180.)  "'[T]he trier of fact looks to all
       the circumstances, including the charged act, to determine whether it was
26       performed with the required specific intent.' [Citations.] Other relevant factors

14

can include the defendant's extrajudicial statements [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or to avoid detection [citation]." (People v. Martinez (1995) 11 Cal.4th 434, 445.)

Here, the evidence established defendant climbed up a fence, broke into the victim's apartment at 11:00 p.m., picked up the victim, put her on his lap facing away from him, and touched her vaginal area over her underwear. Defendant would not let her go despite the little girl's efforts to escape and tried to cover her mouth. Defendant then created a story that he was there to save a little girl and attempted to escape after he was confronted. Under these circumstances, defendant's acts were not susceptible to an innocuous explanation. (People v. Gilbert, supra, 5 Cal.App.4th at p. 1380.) The jury, examining this evidence in the light most favorable to the judgment, could properly conclude this evidence established defendant's lewd intent.

Opinion of California Court of Appeal, lodged March 8, 2005, pp. 30-31.

For the reasons stated by the California Court of Appeal, the court finds that there was sufficient evidence on which a reasonable jury could find petitioner guilty of acting with lewd intent. Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

### B. Sufficiency of Evidence re: Insanity

Petitioner contends that there was not sufficient evidence to support the jury's finding that he was sane at the time of his offense. Although not raised by respondent, this court observes that the United States Supreme Court has not recognized a federal constitutional right to present a sanity defense. Pop v. Yarborough, 354 F. Supp. 1132, 1137 (C.D. Cal. 2005), citing Medina v. California, 505 U.S. 437, 449, 112 S. Ct. 2572 (1992). "One United States Supreme Court case has approved federal habeas corpus review of a petitioner's claim that he 'had been denied due process of law because he had been convicted upon evidence allegedly insufficient to prove beyond a reasonable doubt that he was sane at the time the victim was killed.' Moore v. Duckworth, 443 U.S. 713, 713-14, 99 S. Ct. 3088, 61 L.Ed.2d 865 (1979)." Id., at 1137-1138. "In Moore, however, the applicable state law required the prosecution to

1    prove the defendant's sanity beyond a reasonable doubt."  Pop at 1138, citing Moore, 443 U.S. at

2    713-14, 99 S. Ct. 3088.  "Under Moore, challenges to evidence material to an element of an

3    offense raise constitutional due process concerns cognizable on habeas."  Id.

4            Petitioner's claim regarding his insanity defense is not cognizable under habeas

5    because sanity is not an element of the offenses for which he was convicted.  Pop, citing Gall v.

6    Parker, 231 F.3d 265, 307 (6th Cir. 2000) (finding claim that evidence was insufficient to

7    establish sanity was not cognizable under § 2254 where sanity is not an element of the crime),

8    overruled on other grounds by Bowling v. Parker, 344 F.3d 487, 501 n. 3 (6th Cir. 2003); see also

9    Battie v. Estelle, 655 F.2d 692, 702 n. 23 (5th Cir. 1981) (denying habeas relief for challenge to

10   sufficiency of evidence of sanity because there is no federal constitutional right to present the

11   defense of insanity).  Rather, under California law, insanity is an affirmative defense.  Pop, supra.

12           "Analogously, and by way of contrast, when mens rea is an element of the

13   offense, federal habeas review of the sufficiency of the evidence of the petitioner's state of mind

14   is available."  Pop, citing Ellis v. Armenakis, 222 F.3d 627, 631 (9th Cir. 2000) (entertaining

15   habeas review of sufficiency of the evidence of petitioner's state of mind).

16           Petitioner's claim in the instant case is really a challenge based on state law.  Id.

17   "But a state prisoner is entitled to federal habeas relief only if he is held 'in custody in violation

18   of the Constitution or laws of the treaties of the United States.'"  Pop, quoting 28 U.S.C. §

19   2254(a).  "A challenge to a conviction must therefore do more than pose a question of state law,

20   for such a challenge alleges no deprivation of federal rights and does not merit habeas relief."

21   Id., citing Engle v. Isaac, 456 U.S. 107, 119, 102 S. Ct. 1558 (1982); Estelle v. McGuire, 502

22   U.S. 62, 67-68, 112 S. Ct. 475 (1991).

23           Assuming arguendo that petitioner's challenge to the sufficiency of the evidence

24   of his sanity is cognizable under § 2254(a), the court finds that rational jurors could have also

25   rejected petitioner's insanity defense.  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

26   In making this finding, the court adopts the reasoning of the California Court of Appeal in

16

1    rejecting this claim:

2         California follows the two-prong test adopted by the House of Lords in
          M'Naghten's Case (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718].  Legal
3         insanity is established where "the accused person proves by a preponderance of
          the evidence that he or she was incapable of knowing or understanding the nature
4         and quality of his or her act [or] of distinguishing right from wrong at the time of
          the commission of the offense." (Pen. Code, § 25, subd. (b); People v. Kelly
5         (1992) 1 Cal.4th 495, 533.)  Defendant has the burden of establishing by a
          preponderance of the evidence that he was insane at the time of the crime.
6         (People v. Drew (1978) 22 Cal.3d 333, 348-349).

7         "Because the burden was on the defense to show by a preponderance of the
          evidence that appellant was insane, before we can overturn the trier of fact's
8         finding to the contrary, we must find as a matter of law that the court could not
          reasonably reject the evidence of insanity."  (People v. Skinner (1986) 185
9         Cal.App.3d 1050, 1059 (Skinner I).)  "[I]f neither party presents credible evidence
          on that issue the jury must find [the defendant] sane.  Thus the question on appeal
10        is not so much the substantiality of the evidence favoring the jury's finding as
          whether the evidence contrary to that finding is of such weight and character that
11        the jury could not reasonably reject it."  (People v. Drew, supra, 22 Cal.3d at p.
          351.)

12
          "The value of expert testimony in assisting the trier of fact on the sanity question
13        depends on the material from which the opinion is drawn and on the reasoning of
          the witness."  (Skinner I, supra, 185 Cal.App.3d at p. 1060.)  ""However
14        impressive this seeming unanimity of expert opinion may at first appear...our
          inquiry on this just as on other factual issues is necessarily limited at the appellate
15        level to a determination whether there is substantial evidence in the record to
          support the [court's] verdict of sanity...[Citations.] It is only in the rare case when
16        'the evidence is uncontradicted and entirely to the effect that the accused is
          insane' [citation] that a unanimity of expert testimony could authorize upsetting a
17        ...finding to the contrary." [Citation.] Indeed [the Supreme Court has] frequently
          upheld on appeal verdicts which find a defendant to be sane in the face of contrary
18        unanimous expert opinion.' [Citations.]" (Id. at p. 1059.)

19        In People v. Coogler (1969) 71 Cal.2d 153, 161-166, the defendant presented the
          testimony of a psychiatrist, a psychologist, and a neurologist, who collectively
20        concluded the defendant was unable to commit a murder with deliberation and
          premeditation based upon his diminished mental capacity.  Acknowledging the
21        prosecution presented no contradictory expert testimony, our Supreme Court
          stated, "[a]lthough unanimity of expert opinion carries persuasive value [citation],
22        a jury, under certain circumstances, can properly reject such opinions.  As we
          recently explained in People v. Bassett (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr.
23        193, 443 P.2d 777], '"The chief value of an expert's testimony in this field, as in
          all other fields, rests upon the material from which his opinion is fashioned and
24        the reasoning by which he progresses from his material to his conclusion...'"
          [Citation.]" (Id. at p. 166.)  In Coogler, the court concluded the jury could
25        properly reject the experts' conclusions because of doubt as to the material upon
          which these conclusions were based.  (Ibid.)  "In short, a jury in considering
26        defendant's capacity to premeditate and deliberate could properly accept

                                      17

defendant's evidence or it could equally properly reject the lone psychiatrist's opinion based upon defendant's self-serving descriptions of his alleged past blackouts and lack of memory of the acts in question." (Id. at pp. 167-168, fn. omitted.)

In People v. Samuel (1981) 29 Cal.3d 489, the issue presented was the defendant's current competence to stand trial.  The Supreme Court concluded the jury could not reject the undisputed testimony of five psychiatrists, three psychologists, a doctor, and a nurse that defendant currently did not have the capacity to cooperate with his counsel in defending himself.  (Id. at pp. 497-498, 506.)  The Samuel court recognized the difference between determining a defendant's present competency and "speculating about [the defendant's] state of mind at some time in the past." (Id. at p. 502.)  In making this decision, however, the court noted, "[b]ecause the M'Naghten rule...was defined in terms not of mental capacity but more of moral awareness, and because under that rule the experts were asked to speculate about the defendant's state of mind at the moment the crime was committed, we recognized that their opinions, even when unanimous, were not necessarily controlling." (Id. at p. 502.)

Here, both experts declared defendant was "legally insane" at the time he committed the crimes.  They specifically testified defendant was unable to understand the nature and quality of his actions and was unable to distinguish between right from wrong at the time of the commission of the offenses.  For the following reasons, we conclude the jury could have reasonably rejected this testimony.

As an initial matter, we must note the issue here was not whether defendant had a mental illness.  At trial, even the People conceded defendant had a serious mental illness.  However, simply having a mental illness is not sufficient to establish insanity in California.  The key questions the jury needed to answer was whether as a result of his mental illness, defendant knew right from wrong or whether he appreciated the nature and consequences of his actions.  (People v. Skinner (1985) 39 Cal.3d 765, 768-769 (Skinner II).)

On these key questions, the jury heard the testimony of defendant and was in the unique position to evaluate him and his credibility.  It also heard his statements at the time of the crime.  Evidence of defendant's actions and statements at the time of the crime is powerful evidence of defendant's sanity at the time.  (People v. Wolff (1964) 61 Cal.2d 795, 805-808.)

"Among the kinds of conduct of a defendant which our courts have held to constitute evidence of legal sanity are the following: 'an ability on the part of the accused to devise and execute a deliberate plan' [citation]; 'the manner in which the crime was conceived, planned and executed' [citation]; the fact that witnesses 'observed no change in his manner and that he appeared to be normal' [citation]; the fact that 'the defendant walked steadily and calmly, spoke clearly and coherently and appeared to be fully conscious of what he was doing' [citation]; and the fact that shortly after committing the crime the defendant 'was cooperative and not abusive or combative' [citation], that 'questions put to him...were answered by him quickly and promptly' [citation], and that 'he appeared rational, spoke coherently, was oriented as to time, place and those persons who were

18

present' [citation]." (Id. at pp. 805-806.)

Defendant presented direct evidence of his ability to recognize right from wrong and that he knew the nature and quality of his actions. He relayed the facts of his crime to the jury in great detail indicating his ability to engage in goal-oriented behavior. Moreover, defendant admitted he knew had done something "that wasn't right" when he heard Meely pounding on the door of the apartment. When he was confronted by Meely, defendant's attempt to escape showed he knew what he had done and that it was wrong. Indeed, defendant testified he knew it was not right to molest a child and continued to deny to the jury he had molested the victim even after he was convicted of this crime.

While the eyewitnesses testified defendant was a zombie or out of it, he appeared to snap out of this state quickly. He recognized the people around him and responded to them appropriately. Defendant testified it takes months for him to recover from these episodes and at least a few days of medication before he can understand reality from unreality. Even one of the experts claimed a quick change in his mentality was not likely. Despite his elaborate statement at trial of reasons for climbing into the apartment, defendant did not share them with the arresting officer when he arrived, but instead informed the officer of his mental illness and his medications.

Defendant provided other evidence he understood right from wrong even when he was under the influence of his delusions. Defendant stated he knew it was wrong to murder people even though the voices in his head urged him to kill. Defendant knew it was wrong to kick holes into the wall of his apartment even though the voices told him to do that. Further, defendant testified he knew it was wrong to steal when the voices in his head told him to shoplift.

We believe the jury could have reasonably rejected as speculation the defense experts' attempts to characterize defendant's mental state. Both experts' opinions were based upon medical records that contained a wide range of diagnoses of defendant over the prior years. While both doctors claimed they believed defendant was not malingering, they both admitted defendant had been diagnosed as malingering by other mental health professionals immediately prior to this incident.

The divergence of professional views about the state of defendant's mental health over the years casts doubt on the experts' abilities to properly diagnose this defendant. For example, even at this trial, these two experts disagreed on defendant's fundamental diagnosis. Dr. Nakagawa testified defendant was major depression recurrent with psychotic features. Dr. Nakagawa further contended defendant was not a schizophrenic. On the other hand, Dr. Frank testified defendant's primary diagnosis was schizophrenia.

The psychologists' testimony itself was equivocal on key points. For instance, Dr. Frank testified defendant "would in most cases not be able to distinguish right from wrong." (Italics added.) Dr. Nakagawa testified she was "not wedded to [her] diagnosis or conclusion that defendant suffered from major depression recurrent." Both experts admitted that the numerous impressive sounding tests they administered to defendant did not predict whether defendant was insane at

the time he committed the crimes.

Dr. Nakagawa's original opinion was based solely on defendant's jail records for his current incarceration.  It is true that when she received the remaining records, she concluded nothing in them changed her opinion.  However, her limited review prior to trial based on incomplete medical records reflects on the substance of her opinion.

Another weakness in the experts' opinions is both interviewed defendant significantly after the date of the incident.  Dr. Frank interviewed defendant three months later and Dr. Nakagawa interviewed defendant nine months later.  Thus, their testimony was necessarily speculative as to how defendant was behaving at the time of the crime–months earlier.  In addition, neither doctor independently investigated anything defendant told them.  To the extent the experts relied on the untested statements of defendant, the jury could properly accept or reject these experts' opinions.  (See People v. Coogler, supra, 71 Cal.2d at pp. 167-168.)

Both experts said that methamphetamine use could mimic the psychotic symptoms defendant presented.  Defendant admitted he abused methamphetamine.  Dr. Nakagawa also testified defendant underreported his use of methamphetamine during the interviews upon which she based her opinion.  It is also notable that defendant refused to take a drug test when he was admitted to the mental health hospital the week prior to this incident.  This evidence tended to undermine the opinions of the experts.

Dr. Frank asserted the jury could assess for itself whether defendant knew right from wrong or appreciated the nature of his actions by ascertaining whether defendant acted in a goal-directed manner during the crimes.  The experts admitted that if defendant had covered the victims' mouth, this would be indicative of goal-directed behavior.  Both admitted possession of the screwdriver could also be evidence of goal-directed behavior to break into the apartment.  Finally, Dr. Nakagawa admitted the lunging at Meely, shown by the evidence at trial, could be construed as goal-directed behavior.

Finally, we note the trial court rejected defendant's argument the evidence was insufficient to establish his sanity in the context of a motion for a new trial.  The trial court could not "find that the verdict was contrary to the evidence in this case."

We agree with the trial court that there was substantial evidence to support the jury's verdict of sanity.  The jury could have reasonably rejected defendant's expert opinion evidence of insanity.  This is not the rare case where the unanimity of expert testimony authorizes us to upset the jury's finding to the contrary. [Footnote 3]

> [Footnote 3: We find the People's argument that Dr. Frank's and Dr. Nakagawa's testimony was "inherently suspect *ab initio* because they were psychologists rather than psychiatrists" to be disingenuous at best.  As pointed out by defendant, as long as they are qualified, licensed psychologists with doctoral degrees in psychology they may properly testify as to the sanity of a person at trial.  (§ 1027 (a); People v.

1       <u>Davis</u> (1965) 62 Cal.2d 791, 801.)]

2   Opinion of California Court of Appeal lodged March 8, 2005, pp. 22-30.

3           For the reasons found by the California Court of Appeal, this court finds that

4   rational jurors could have found petitioner sane.  The bottom line is that jurors are not compelled

5   under the Constitution to believe experts, especially impeached ones.  <u>See</u> <u>Dennis ex rel. Buthaw</u>

6   <u>Budge</u>, 378 F.3d 880, 905 (9th Cir. 2004) (Bergon, J. concurring); <u>United States v. Woodson</u>, 526

7   F.2d 550, 551 (9th Cir. 1975).  The denial of this claim by the California Court of Appeal was not

8   an unreasonable application of clearly established Supreme Court authority.  Accordingly, this

9   claim should be denied.

10          C.  <u>Eighth Amendment</u>

11          Petitioner contends that his sentence of 25-years-to-life is cruel and unusual in

12  violation of the Eighth Amendment.  Petitioner was sentenced pursuant to Cal. Pen. Code §

13  667.61 which authorizes sentences of 25-years-to-life for persons convicted of specified sex

14  offenses, including lewd acts upon children under the age of 14, under certain circumstances,

15  including if the defendant committed the offense during the commission of a burglary.  Cal. Pen.

16  Code § 667.61(d)(4).  Petitioner's sentence was not based on his criminal history, but rather on

17  the circumstances of the offense.

18          The California Court of Appeal rejected this claim on the following grounds:

19      Defendant relies on <u>Solem v. Helm</u> (1983) 463 U.S. 277 [77 L.Ed.2d 637] and
        <u>Harmelin v. Michigan</u> (1991) 501 U.S. 957, 1001 [115 L.Ed.2d 836, 869].  In
20      <u>Crooks</u>, <u>supra</u>, 55 Cal.App.4th at pages 805-806, we analyzed <u>Solem</u> and
        <u>Harmelin</u>.  We rejected that defendant's claim that his 25-year-to-life sentence for
21      a rape committed during a burglary was cruel and unusual punishment.  (<u>Crooks</u>,
        <u>supra</u>, 55 Cal.App.4th at pp. 805-806.)  We noted, "[i]n <u>Solem</u>, the court found
22      unconstitutional a life sentence without the possibility of parole for a seventh
        nonviolent felony.  A bare majority of the court held '...a court's proportionality
23      analysis under the Eighth Amendment should be guided by objective criteria,
        including (1) the gravity of the offense and the harshness of the penalty; (2) the
24      sentences imposed on other criminals in the same jurisdiction; and (3) the
        sentences imposed for the commission of the same crime in other jurisdictions.'
25      [Citation.]" (<u>Id.</u> p. 805.)  We concluded that "<u>Solem</u> is weakened by <u>Harmelin v.</u>
        <u>Michigan</u> (1991) 501 U.S. 957 [111 S.Ct. 2680, 115 L.Ed.2d 836], in which a life
26      sentence without possibility of parole for possessing 672 grams of cocaine was

upheld." (Ibid.)  In Harmelin, seven justices supported a proportionality of review but only four favored application of all three factors set forth in Solem.  (Crooks, at pp. 805-806.)  We also noted "[t]he defendant in Harmelin was lawfully sentenced to life without parole (LWOP) for possessing a large quantity of drugs. Defendant here, a forcible rapist, received a lesser sentence." (Id. at p. 806.)  We concluded "Defendant's sentence is not 'grossly disproportionate' to defendant's more serious crimes." (Ibid.)

The Supreme Court of the United States has upheld statutory schemes that result in life imprisonment for recidivists upon a third conviction for a nonviolent felony in the face of challenges that such sentences violate the federal constitutional prohibition against cruel and unusual punishment. (See Ewing v. California (2003) ___ U.S. ___, [115 L.Ed.2d 108] [25 years to life sentence under three strikes law for theft of three golf clubs worth $399 apiece]; Lockyear v. Andrade (2003) ___ U.S. ___, [155 L.Ed.2d 144] [two consecutive terms of 25 years to life for two separate thefts of less than $100 worth of videotapes].)

In this case, as we discussed in connection with his California constitutional claim, defendant's sentence is not grossly disproportionate to the crime for which he is being punished.  As a result his Eighth Amendment claim must fail.

Opinion of California Court of Appeal lodged March 8, 2005, pp. 37-39.

In the abstract, respondent is correct that "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." Ewing v. California, 538 U.S. 11, 21, 123 S. Ct. 1179 (2003); see also Harmelin v. Michigan, 501 U.S. 957, 995-96, 111 S. Ct. 2680 (1991) (upholding sentence of life without parole for a drug possession felony).  The Supreme Court has acknowledged that its "precedents in this area have not been a model of clarity." Lockyear v. Andrade, 538 U.S. 64, 71, 123 S. Ct. 1166 (2003).

However, respondent has missed the gist of the issue in this case.  The issue is not whether lewd acts, however violent and injurious, in connection with burglary, in the abstract constitutionality merit a 25-years-to-life sentence, but rather whether a person with petitioner's undisputed serious mental illness at the time of the crime could be constitutionally sentenced to a lewd act crime without physical injury whose penalty is the precise equivalent to first degree murder.

\\\\\

22

1    With respect to mental illness, the Supreme Court has only intervened in an

2  Eighth Amendment sentencing context in capital cases; it held that seriously mentally retarded

3  persons could not be given the death penalty.  <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S. Ct. 2242

4  (2002).  And, that action was taken only recently.  The undersigned cannot say in this AEDPA

5  context that in non-capital cases clearly established Eighth Amendment law requires the

6  consideration of mitigating factors.  Indeed, circuit courts have held that it does not.

7              Uphoff's five year sentence does not violate the Eighth Amendment or any other
             provision of the federal Constitution. There was ample evidence by which the jury
8            could reject his insanity defense, and the imposition of a statutory mandatory
             sentence without consideration of mitigating factors does not violate the Eighth
9            Amendment in circumstances like this.  <u>See</u> <u>Harmelin v. Michigan</u>, 501 U.S. 957,
             994-95, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); <u>United States v. Rudolph</u>, 970
10           F.2d 467, 469 (8th Cir.1992).

11  <u>U.S. v. Uphoff</u>,  232 F.3d 624, 626 (8th Cir. 2000).

12           One can question the prosecutor's charging and sentencing position given the

13  facts here—a clearly, seriously mentally deficient person, who in military fatigues, cowboy boots

14  and a trench coat was climbing up over a balcony rail "to save the girl," but then, entered his

15  upstairs neighbor's apartment without permission and molested her daughter by engaging in a

16  "touching" crime without physical injury.  While this defendant clearly needed to be off the

17  streets until long term mental stabilization could be effected, he is simply off the streets at this

18  time for life.  His possibility of parole regardless of recovery is realistically non-existent.  His

19  possibility for effective treatment, although not out of the question, is slim to none.  However,

20  questions do not equate with constitutional violations.  Petitioner's Eighth Amendment claim

21  should be denied.  Accordingly, this court finds that the California Court of Appeal's decision

22  finding that petitioner's sentence did not violate the Eighth Amendment was not contrary to or an

23  unreasonable application of clearly established federal law.

24           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

25  a writ of habeas corpus be denied.

26  \\\\\

1    　　　　These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within ten days after service of the objections.  The parties are advised

7    that failure to file objections within the specified time may waive the right to appeal the District

8    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:   8/16/05

10

11   　　　　　　　　　　　　　　　　　　　　/s/ Gregory G. Hollows

12   　　　　　　　　　　　　　　　　　　　_____
     　　　　　　　　　　　　　　　　　　　GREGORY G. HOLLOWS

13   ggh:kj                              UNITED STATES MAGISTRATE JUDGE
     rath2097.157

14

15

16

17

18

19

20

21

22

23

24

25

26